### No. 29,479

### First Circuit

### SHERIDAN v. NEW ORLEANS GREAT NORTHERN RAILROAD COMPANY

(June 12, 1928. Opinion and Decree.)
(June 30, 1928. Rehearing Refused.)
(October 2, 1928. Writ of Review granted by Supreme Court.)
(November 26, 1928. Reversed by Supreme Court. Docket No. 29,479.)

Rownd & Warner, of Hammond, attorneys for plaintiff, appellee.

B. M. Miller, of Covington, attorney for defendant, appellant.

ELLIOTT, J. J. Houston Sheridan claims of New Orleans Great Northern Railroad Company, the value of a carload of cattle which the railroad accepted from him at Slidell, La., for shipment, consigned to himself at Bogalusa, La.

The plaintiff alleges that the car of cattle was worth $1570.30. That the railroad company, after transporting the car to Bogalusa, refused to deliver it to him at the place agreed on and called for by the bill of lading and finally appropriated the cattle to its own use.

The defendant denies that it owes the amount. It admits that its agent at Slidell accepted the cattle and delivered to plaintiff the bill of lading annexed to his petition, but alleges that same contemplated the delivery of the car at defendant's regular cattle pen in the City of Bogalusa, and not as alleged by the plaintiff. It further alleges a contract of lease entered into between it and D. E. Sheridan, whereby it leased to D. E. Sheridan a portion of its right of way at Bogalusa as a location for a dipping vat and stock pen. That D. E. Sheridan built a stock pen and constructed a dipping vat thereon. That by agreement between D. E. Sheridan and itself, the lease was brought to a close on July 15, 1927, after which time D. E. Sheridan promised and agreed not to ship any more cattle to be unloaded and reloaded at the stock pen which he had built. That at the time the bill of lading in question was issued, July 23, 1927, the cattle pen and dipping vat which D. E. Sheridan had built and constructed was not in operation. That same was not a public pen and dipping vat. That plaintiff had no right to have his cattle unloaded at the stock pen and dipping vat, which we will herein afterwards refer to as the Sheridan pen. That plaintiff's cattle were unloaded at its regular stock pen at Bogalusa. That plaintiff refused to receive them there and pay the freight, thereby forcing defendant to sell them as unclaimed freight. That after the sale and all expenses had been paid, there remained $601.90. That said sum had been tendered to the plaintiff, but that he refused to receive the amount.

Defendant prays that plaintiff's demand be rejected at his cost.

The evidence shows that the railroad company had its own stock pen at Bogalusa at which cattle could have been unloaded, but the railroad did not maintain a dipping vat. Quarantine regulations had existed against the shipment of cattle from the Parishes of Washington, St. Tammany and Tangipahoa for several years on account of tick infection. This quarantine prevented the shipment of cattle unless they had been dipped and inspected by certain officers, consequently there had been no cattle received at or shipped out of the railroad pen for several years. This ban had caused great loss to cattle owners in these parishes.

An arrangement between the New Orleans, Great Northern Railroad Company, and D. E. Sheridan was entered into, whereby D. E. Sheridan leased from the railroad company, a parcel of ground within the incorporated limits of the City of Bogalusa, and erected the cattle pen and constructed the dipping vat metnioned by the witnesses. The railroad company in order to facilitate the transportation to the Sheridan pen for dipping and re-shipment of cattle from Bogalusa into the markets situated in tick free territory, constructed a switch track from its main line to the said Sheridan pen. The quarantine regulations permitted the shipment of cattle after they had been dipped and inspected.

The railroad company also arranged a special tariff for the benefit of cattle owners under which the shipment of cattle to Bogalusa for the purpose of having them dipped, inspected and re-shipped, could be made over said line for less than would otherwise have been the charge for said shipments.

The clause contained in the lease to the effect that the premises were not to be occupied by any other person than D. E. Sheridan without written consent of the lessor first obtained, was not observed. The evidence shows that a number of cattle owners living in Washington Parish drove their cattle to the Sheridan pen, dipped and shipped them over defendant's line to the markets, paying D. E. Sheridan a small fee sufficient to keep the vat charged and to defray the expenses of inspection. The number of cattle carried to the pen however, led to conditions which resulted in litigation between D. E. Sheridan and the railroad company on one side and certain citizens of Bogalusa living near the pen, on the other, with the result that in May, 1927, a judgment was rendered in favor of certain citizens enjoining D. E. Sheridan and the railroad company from "operating or permitting to be operated near Bogalusa Terrace in the City of Bogalusa, a dipping vat, cattle pens and shipping pens, in such manner as to become a nuisance from odors, filth, flies or noises or from other factors which might cause or create a nuisance." The City of Bogalusa also took a hand in the matter and objected to the pen and vat.

After the judgment, D. E. Sheridan entered into an agreement with the railroad company that no more cattle would be shipped by him to be unloaded, dipped and re-shipped from the Sheridan pen after July 15th, but the evidence shows that the railroad company permitted him to ship several cars of cattle into Bogalusa under the tariff in effect for that purpose on the next day, July 16, 1927. The cars were transported to the Sheridan pen, unloaded, the cattle dipped and then re-shipped to market from that pen, but no more shipments were made by D. E. Sheridan after that time.

The railroad company, however, did not put the tariff aside which had been put into effect for the purpose stated until after July 23, 1927, when plaintiff shipped. The tariff was in force and effect at the time plaintiff's shipment was received. At that time, defendant's agent along its line had not received any notice that no more cattle were to be received under same for shipment to Bogalusa to be unloaded at the Sheridan pen, dipped and re-shipped from thence to market.

Plaintiff, a son of D. E. Sheridan, testifies that at the time of his shipment, July 23, 1927, he was not aware of the agreement that had been entered into between his father and the defendant, that

no more cattle were to be shipped into Bogalusa to be unloaded at the Sheridan pen, dipped and re-shipped from thence to market. He testifies that he bought the car of cattle, obtained from defendant at Slidell the bill of lading annexed to his petition, loaded the car and had it transported to Bogalusa to be unloaded at the Sheridan pen the cattle dipped and thence re-shipped to market, in good faith, and there is no evidence to the contrary.

As for the defendant, its agent at Slidell not having received the notice also acted in good faith. The tariff being in fact still in effect, he received the shipment, issued to plaintiff a bill of lading that he had a right to issue, wrote across its face "to be dipped and re-shipped," delivered it to plaintiff, and had the car transported to Bogalusa to be unloaded at the Sheridan pen, to the end that plaintiff might dip the cattle and immediately re-ship them to market. But when the car arrived at Bogalusa, other agents of defendant thought that if the cattle were unloaded at the Sheridan pen, or hauled out of Bogalusa after having been dipped there, defendant might get into trouble with the Court and the city authorities. The car was therefore stopped at its own pen, unloaded, and plaintiff called on to receive them there and pay the freight. The plaintiff declined to do so, and insisted that defendant transport the car to the Sheridan pen, to the end that it might be unloaded there, the cattle dipped and from thence re-shipped to market in conformity with the provisions of the bill of lading. Defendant refused to transport the car to the Sheridan pen. The plaintiff testifies, and we are satisfied that such was the case, that defendant not only declined to transport the car to the Sheridan pen but declined to haul any more cattle out of Bogalusa that had been dipped at the Sheridan pen, and it so informed the plaintiff by its agents.

The defendant offered evidence to the effect that plaintiff, if he wanted to, could have received the cattle at the railroad pen and have driven them to the Sheridan pen at an expense not exceeding ten dollars. We have considered that such could have been done and the cattle driven back to the railroad pen; that it was plaintiff's duty to minimize damage, etc. But in the face of the evidence that we have accepted that defendant would not transport away from Bogalusa any more cattle that had been dipped at the Sheridan pen, nothing would have been accomplished by driving the cattle from the railroad pen to the Sheridan pen, dipping them there, and driving them back to the railroad pen. The cattle would still have been on plaintiff's hands, and he would have been powerless to get them to market in tick free territory. We have also considered that plaintiff might have driven the cattle to some other railroad, but if he had tried to reach a market in that way, the expense would have been such, that the cattle would have been as good as lost to him. The defendant was at fault for receiving the cattle and transporting them to Bogalusa under the contract in question. The act of the defendant reduced plaintiff to the necessity of selling his cattle at Bogalusa for what he could get, or else driving them away and going to some other railroad and shipping them over it to market if he could, the expense of which would have left him

312

practically nothing; or else he could have abandoned them at Bogalusa to defendant, as he did, and claim their value.

The district judge after reviewing the case in a written opinion reachd the conclusion that the defendant was liable to the plaintiff for the value of the cattle, and we have come to the same conclusion.

Every act whatever of man, that causes damage to another, obliges him by whose fault it happened to repair it.

The district judge value that cattle at $1440.00, allowing interest at five per cent on the amount from July 28, 1928, until paid.

We have considered the question of value and the evidence does not warrant a reduction of the amount.

The plaintiff in answering the appeal, prays that the amount be increased. We do not think this request should be granted.

The check for $601.90 contained in the record, and which represents the net proceeds of the cattle left after the expenses of their keeping and sale had been paid, should be turned over to the plaintiff, and when paid, the amount should be credited on the judgment herein, and it is ordered that it be done. Subject to said conditional credit, the judgment appealed from is correct and will be affirmed.

Judgment affirmed. Defendant and appellant to pay the costs in both courts.