(119 So. 530)

No. 29479.

SHERIDAN v. NEW ORLEANS GREAT NORTHERN R. CO.

In re NEW ORLEANS GREAT NORTHERN R. CO.

Nov. 26, 1928. Rehearing Denied Jan. 2, 1929.

Benjamin M. Miller, of Covington, for applicant.

Rownd & Warner, of Hammond, for respondent.

THOMPSON, J. This is a suit for the value of 48 head of cattle shipped by the plaintiff over defendant's railroad from Slidell to the city of Bogalusa. The cattle were consigned to the shipper's order under the Uniform Live Stock Contract, which had written across its face in pencil the words, "To be dipped and reshipped."

When the shipment reached Bogalusa, the plaintiff demanded that the cattle be delivered at a dipping vat which was located in the town about a quarter of a mile from the railroad depot, but the defendant refused to do so because the vat had been discontinued and the lease under which the vat had been operated had been canceled. The plaintiff was then requested to accept the cattle and pay the freight, but he refused to do so. The

cattle were unloaded in defendant's stock pen and afterwards placed in a pasture some ten miles out of Bogalusa.

In due time, and after proper notice and advertisement, the cattle were sold at public auction and realized $601.90 after paying the freight, cost of keeping the cattle, and expenses of the sale.

A check for this amount was tendered plaintiff, which he refused to accept, and this suit followed.

The district court rendered judgment in plaintiff's favor for $1,440, and that judgment was affirmed by the Court of Appeal.

It appears that some time in 1926 the railroad company leased to D. E. Sheridan, the father of the plaintiff, a portion of its right of way at Bogalusa as a location for a dipping vat and stock pens.

There was a provision in the lease by which either party might terminate the lease at any time on giving 30 days' notice.

The stock pen of defendant had not been used for several years owing to a quarantine against tick-infested cattle. After the dipping vat was constructed, some five carloads of cattle were shipped to Bogalusa at different times and were unloaded by the defendant at the stock pens of Sheridan. These several cars, however, were of cattle belonging to Sheridan.

There had been no other cattle shipped in and delivered at the vat, though a number of cars had been shipped out, of cattle which were driven in and dipped at the vat.

The vat was operated by Sheridan, for which he charged a small fee per head.

The vat and stock pens became a nuisance to the citizens of Bogalusa, and suit was brought to abate it, and in May, 1927, judgment was rendered enjoining Sheridan and the railroad company from operating, or permitting to be operated, the dipping vat and stock pens in such a manner as to become a nuisance.

On May 6th the defendant notified Sheridan that said lease was terminated, effective 30 days from that date. At the request of Sheridan, however, he was permitted to remain in possession of the premises up to July 15, 1927. The last carload of cattle dipped at the vat was shipped out on July 16th.

After that date neither Sheridan nor any one else had the right to use the dipping vat or the stock pens of Sheridan for the purpose of receiving or delivering cattle except with the consent of both the defendant company and Sheridan.

The plaintiff's cattle were shipped to Bogalusa on July 23d, one week after the lease of his father had terminated and dipping operations had ceased altogether.

The plaintiff denied that he had knowledge of the cancellation of the lease, but he admits that he was working for his father and admits that he made the shipment of July 16th the day after the stock pens and the dipping vat had been closed, or should have been closed, to the public under the agreement between his father and the defendant company.

The Court of Appeal seems to have based its opinion on the fact that the defendant company had in its bill of lading obligated itself to deliver the plaintiff's cattle at the stock pen of the plaintiff's father. We do not so read the contract. The contract in express language stipulated that the cattle should be carried to the usual place of delivery at the point of destination, which was Bogalusa.

We do not find any agreement in the bill of lading which required the delivery to be made at any point in Bogalusa other than the stock pens of defendant located on its right of way.

The pencil notation made by the agent did not obligate the defendant to deliver the cattle at the pens of plaintiff's father.

The defendant company had established a special tariff on all cattle which would be

shipped in on its road and which were dipped and shipped out.

The transportation to the vat for dipping, reloading, and shipping out was in the nature of a privilege in transit, and when availed of entitled the shipper to a reduced freight rate. After the lease from defendant was canceled and the vat for all intents and purposes was no longer open to the people, there was no legal obligation on the railroad to deliver the cattle at the vat.

Our conviction is that no obligation was assumed by the defendant, either under the terms of its bill of lading or under the pencil notation, to deliver the consignment at any other point in Bogalusa than its own stock pens, which must be regarded as the usual place of delivery of such shipments.

■ But aside from this, the dipping vat and the pens of plaintiff's father were closed to the public, and the plaintiff was without right, legal or contractual, to require or to demand that the defendant make delivery at the vat. The land on which the vat and pens were located was the property of defendant, was in its possession and under its control, and the privilege of using said land either for corralling or dipping cattle had ceased a week before plaintiff shipped his cattle.

The plaintiff could not have been deceived as to the existence of the situation. He was in a much better position to know that the vat and Sheridan pens had been closed than was the defendant's agent at Slidell.

■ The Court of Appeal found that plaintiff could have received the cattle at the railroad pen and have driven them to the Sheridan pen at an expense of $10, and that it was the duty of the plaintiff to have thus minimized his damages.

The court was of the opinion, however, that nothing would have been accomplished by pursuing that course, and therefore exonerated plaintiff from fault.

In thus holding, the court proceeded on the assumption that the defendant would not have transported the cattle after they were dipped.

This assumption, it appears to us, is not justified by the record. The statement made by the plaintiff that the defendant's superintendent or agent said that he would not ship the cattle out after they were dipped is denied by the railroad officials.

Moreover, the plaintiff was bound to know that the company could not refuse to transport the cattle after they had been dipped if tendered for shipment.

The proper course for the plaintiff to have pursued was to accept the cattle, have them dipped with his father's consent and that of the defendant (the latter not being unwilling to give its consent), and then to tender them to the defendant for shipment. If shipment had been refused, then plaintiff could have disposed of the cattle and sued for the resulting loss or damage.

The whole expense if this course had been adopted would not have exceeded $10 as found by the Court of Appeal.

■ The reason for holding the plaintiff guiltless for not accepting the cattle is obviously unsound and unsupported by the record.

Whatever damage the plaintiff may have suffered is due to the fact that he did not avail himself of the opportunity to save himself or to minimize his threatened loss.

■ It results from what we have said that the judgment under review will have to be reversed. The plaintiff, however, is entitled to have the check for $601.90 returned to him for collection.

For reasons assigned, the judgment of the Court of Appeal, as well as that of the district court, is reversed, and the demand of the plaintiff is rejected, at his cost in all courts.