GLASER v. THE N. O. T. & M. RY. CO. ET AL.

———

(March 4, 1929. Opinion and Decree.)
(April 1, 1929. Rehearing Refused.)
(May 21, 1929. Writ of Certiorari and Review Refused by Supreme Court.)

———

Prowell, McBride and Ray, Welton P. Mouton, of New Orleans, attorneys for plaintiff, appellee.

Lemle, Moreno and Lemle, of New Orleans, attorneys for Illinois Central R. Co., defendant, appellant.

Wm. H. Talbot, of New Orleans, attorney for New Orleans T. & M. Ry. Co., defendant, appellant.

JONES, J. Plaintiff sues for $1,185 as damages to 47 head of mixed cattle, shipped by him on March 1, 1927, from Lottie, La., to C. H. Rice & Son, in New Orleans, over the lines of the New Orleans, Texas & Mexico Railway Company. He alleges that the cattle, which were in good condition, cost him $1,347, but when car reached New Orleans on March 3, 1927, 8 of the cattle had died in transit, and between that day and March 11, 1927, when cattle were sold, 19 more died, all the deaths being due to the delay and negligent handling of the car by the railroads in not feeding and watering them; the remaining cattle, 20 head, when sold, netted the sum of $161.45, which amount, deducted from the cost price, caused the above-stated loss.

After filing the suit against the New Orleans, Texas & Mexico Railway Company plaintiff, having discovered that the Illinois Central Railroad Company and the New Orleans, Natalbany & Natchez Railway Company had participation in the shipment, filed a supplemental petition, making the latter two railroads parties defendant, and praying for solidary judgment against all three.

The railroads denied negligence and averred due care in handling the shipment. Both the New Orleans, Texas & Mexico Railway Company and the Illinois Central Railroad Company pleaded exemption of liability under the livestock contract from damages caused by disinfection of cattle, and averred that the cattle died as a result of dipping in an arsenic solution, for which they were not responsible.

The New Orleans, Natalbany & Natchez Railway averred that it received the car of cattle from the Illinois Central Railroad Company at Natalbany, and that it only moved the car 3 miles to a dipping vat at Woodhaven, where the cattle were unloaded and dipped under the direct supervision of the plaintiff; that it then hauled the cattle back to Natalbany, where their responsibility ceased.

The trial judge allowed plaintiff a solidary judgment for $1,185.55 against the New Orleans, Texas & Mexico Railway Company and the Illinois Central Railroad Company, and dismissed plaintiff's suit against the New Orleans, Natalbany & Natchez Railway Company, from which judgment of dismissal plaintiff did not appeal.

The record shows the following:

The cattle were loaded at 4 p. m., March 1st, at Lottie, La., on the lines of the New Orleans, Texas & Mexico Railway, and were promptly moved by this railway to Baton Rouge, where the car was received by the Yazoo & Mississippi Valley Railroad Company, for account of the Baton Rouge, Hammond & Eastern Railway at 7:09 p. m., March 1st. The Baton Rouge, Hammond & Eastern moved the car out of Baton Rouge for Hammond at 10:55 p. m. on its first train. Ordinarily a shipment would go from Lottie to Baton Rouge, and thence direct to New Orleans over the lines of the Yazoo & Mississippi Valley Railroad, but these cattle were sent via Hammond, to be dipped, on instructions from plaintiff.

Plaintiff complains of 3-hour delay at Baton Rouge, but in view of the fact that this route was seldom used, and the cattle were shipped on the first train, we do not find that delay unreasonable. The shipment, which left Baton Rouge at 10:55 p.

m., arrived at Hammond, 45 miles distant, at 12:45 a. m., March 2d, but did not leave there until 3 p. m. Here the first and perhaps only serious delay occurred, due to the fact that the agent of the New Orleans, Texas & Mexico at Lottie noted on the waybill that the car was to stop at Central Dipping Station, Hammond. This was an error, as the dipping station is not at Hammond, but at Woodhaven, La., on the lines of the New Orleans, Natalbany & Natchez Railway Company, 3 miles from Natalbany, the nearest point on the Illinois Central Railroad. The car finally reached Natalbany at 3:15 and was there delivered to the New Orleans, Natalbany & Natchez Railway, for transportation to Woodhaven, where the dipping vat was located. The car reached the dipping vat at 4:20 p. m., and was there turned over to the plaintiff, Dr. Warren, the owner of the vat, and Dr. Ward, inspector of the Louisiana live stock sanitary board, and also agent of the United States Bureau of Animal Industry, and one Bankston, who had been employed by plaintiff to assist in dipping the cattle.

These gentlemen, who had been requested by Glaser to be present, that the cattle might be quickly dipped, had no connection with the railroads.

At Natalbany one calf was found dead in the car, but the rest of the cattle were in fairly good condition, according to plaintiff's own admission, except that they were tired from the trip. Though there was running water in the pen where the cattle were placed, all the witnesses say that they did not see them drink.

Dr. Ward testifies as follows: Cattle reached the vat about 4:30 p. m. He then told Glaser that it was dangerous to dip the cattle so late in the afternoon, as they would not have time to dry before ship-

ping; but Glaser insisted on so doing, as he wished to get the cattle to New Orleans for the market of March 4th. Accordingly the cattle were dipped at once, and, after having remained in the shipping pen about an hour, they were reloaded, still wet with arsenic solution, and started on their return journey to New Orleans; that cattle should be dipped in the morning, and they should be allowed 2½ to 3 hours to dry out before loading; otherwise, they may absorb the arsenic solution, if they are packed in a car while wet.

Dr. Warren, owner of the vat, and Bankston, who was employed by Glaser to assist with the dipping, both confirm Dr. Ward as to what happened at the dipping vat, though Glaser denies it in part.

The car which left Woodhaven for Natalbany at 6:10 reached New Orleans on March 3d, at 10:45 a. m., having been stopped at Hammond 4⅓ hours while waiting for a through train, and at Harahan 3 hours for orders from the Southern Railway official, with which railway the Illinois Central shares use of switch track to the stockyards.

The total distance covered by the cattle was 131 miles, and the time consumed was 26 hours.

When cattle arrived at the yards, one yearling was down and in dying condition, and 6 others were dead in the car. The yearling died before they could be unloaded, and 19 more died while in the stock pens of the consignee before the balance were sold on March 11th for $368.

Dr. Moore, a veterinarian of 30 years' experience, who was requested by the Illinois Central Railroad to inspect the carcasses of the dead cattle, testified that he performed a post mortem on 7 of the cattle on March 3rd, about 3 or 4 hours after the arrival of the car, and that he found the cattle had died from arsenic poisoning; that later he performed another post mortem on 6 more of the cattle, and found that they had died from the same cause; that in performing these post mortems he had removed the viscera from the cattle, and had subjected the viscera of two or three cows to a chemical test, which showed arsenic reactions, but that he had not conducted experiments on all 13, because the contents of the stomach of the others were in the same condition as those of the two actually tested; that arsenic ordinarily affects cattle in 12 to 54 hours, and that they absorb either by drinking the solution or through the skin, by being packed in the cars while damp.

Although plaintiff and another witness testify that these cattle had been fed on cottonseed meal for some time before they were shipped, and that they were in good condition when placed on the car, the evidence of all the railroad men and of all the stockyard men, who saw the cattle later on, is to the effect that they were very poor, and in very bad physical condition, and on this point the preponderance of the evidence is certainly with the defendant.

Plaintiff contends that the cattle should have been fed and watered while in the custody of the railroads, but the railroads contend that a 36-hour release was signed by shipper, and we think their contention is sustained by the following evidence.

The waybill bears the printed notation, "Has 36-hour release been signed and filed at point of origin? (Yes or No)," followed by the typewritten word "Yes." The freight bill introduced in evidence by plaintiff, in the record marked for identification "P 5," bears the notation, "36-Hr.

relse. signed A 983235 IC 2," and nowhere in the record is there any denial that a 36-hour release was signed.

Plaintiff's able attorney, both in his argument and brief, emphasizes the fact that this suit is brought in tort under article 2754 of the Civil Code, which provides that carriers are liable for damage unless they prove that such damage was caused by accidental or uncontrollable events, and he denies that the limitation in the live stock contract is controlling, on the ground that such limitation was granted without any consideration.

We do not think that it matters much whether the suit be considered one in tort or one on the live stock contract. The only effect of its being considered a tort action, under article 2754 of the Civil Code, is to place the burden of proof of due care on the railroad company, and the above analysis of the evidence shows conclusively that they have borne that burden in this case. In fact, the Supreme Court has held that this burden is sustained when the carrier shows that stock has been moved promptly, without any jolts or unusual rough handling. Simms & Son vs. N. O. & N. E. R. Co., 122 La. 268, 47 So. 602. We are convinced that the evidence shows that the proximate cause of the death of the cattle was arsenic poisoning, and that the unusual delay in handling the shipment was only a remote cause.

The limitation in the live stock contract, to the effect that the railroads would not be liable for injuries caused by dipping or disinfection, is valid. It is not the duty of common carriers in this state to take charge of the dipping of cattle, and such a duty is not imposed by article 2754 of the Code. When the railroad agreed to transport the cattle to Natalbany for dip-

ping, there was a valid consideration for this limitation.

In the case of McHenry Horse Exchange vs. Illinois Central R. Co., 148 La. 49, 86 So. 649, where suit had been brought for the death of a horse, under article 2754 of the Civil Code, just as in this case, the Supreme Court, after full consideration of all the authorities said:

"The contractual limitation entered into between the parties relieved the railroad company from the loss of the death of live stock, unless the same was caused by negligence on the part of the railroad company, its agents, or employees."

In the case of Memphis & C. Railroad Co. vs. Reeves, 10 Wall. (77 U. S.) 176, 19 L. Ed. 909, it was held that an unreasonable delay in transporting a shipment did not make the railroad liable, where the proximate cause of the damage to the goods was a flood of the Tennessee river, which could not have been foreseen.

The record convinces us that Glaser superintended the dipping of the cattle, and that it was on his instructions that the cattle were loaded into the car, while still wet with the arsenic solution. Had he ordered the cattle to be detained at Woodhaven until they were thoroughly dried out and properly fed and watered, then he would have fulfilled his full duty to minimize his damages. On this point the Supreme Court recently, in the case of Sheridan vs. N. O. G. N. R. R. Co., 9 La. App. 308, 119 So. 530, said:

"Whatever damage the plaintiff may have suffered is due to the fact that he did not avail himself of the opportunity to save himself or to minimize his threatened loss."

This case seems to us particularly applicable here.

For above reasons, the judgment is reversed, and it is now ordered that plaintiff's suit be dismissed, at his cost in both courts.