HIGGINS, Justice.
 

 Plaintiff, as shipper and consignee, brought this suit against the defendant carriers in solido, to recover the sum of $3,445, representing damages said to have been sustained as a result of the loss of 98 cows and 1 calf, which were alleged to have been so badly injured, due to the rough and negligent manner in which they were handled by the railroads, that some of them died en route and others within 24 hours after their arrival.
 

 The defendants denied the charges of negligence, and averred that the cattle were transported in a prudent and careful manner, and specially pleaded the clauses of the uniform live stock bill of lading prescribed by the Interstate Commerce Commission, exempting the carrier from liability for damages occasioned by disinfection' done under quarantine regulations, averring that the cattle died of arsenical poisoning, as a result
 
 *866
 
 of being dipped in such a solution, while in plaintiff’s charge, before being shipped.
 

 There was judgment in favor of the defendants dismissing the suit, and plaintiff has appealed.
 

 The record shows that the plaintiff purchased a herd of cattle in Cameron parish during the latter part of February, 1927, and immediately had them dipped in an arsenic solution for the purpose of destroying ticks, in order to meet with quarantine regulations. About eight days after the first dipping, or on or about March 8, 1927, the cattle were again dipped. Neither of these dippings was made under government supervision. On March 16, 1927, the cattle were driven overland a distance of about 12 miles, crossing the Calcasieu river. The following day they were driven in close proximity to Lake Charles, and the next morning, into Lake Charles, to the central dipping vat, where they were dipped a third time under government supervision. The cattle were then loaded into the railroad cars under plaintiff’s direction and supervision, 366 grown cattle being placed in eleven cars and 126 calves in one car. At 4:30 p. m. the train left Lake Charles and started for its destination, Torras, La., a distance of 160 miles. In addition to the initial carrier, there were two connecting carriers, and the trip required 14 hours. En route the grown cattle became unruly in the cars, and an inspection at different points showed that some of them had died and others were down, and the final inspection at destination revealed that 41 head of cattle were dead and 34 head were down. There was one calf dead, which died as the result of having its side crushed; the other calves were in good condition. Within 24 hours after the shipment arrived, an additional 5S head of cattle died. Suit was filed on March 15, 1929, and tried on January 19, 1931.
 

 The testimony of the employees of the respective carriers in charge of the shipment showed that the cattle were delivered to the Missouri Pacific Railroad Company at Lake Charles and were delivei’ed to the New Orleans, Texas & Pacific Railway Company at Kinder, La., which railroad hauled them to .Anchorage, La., and in turn delivered them to the Texas & Pacific Railway Company, which moved the cattle to the point of destination, Torras, La. The testimony of these witnesses is to the effect that there was no accident, quick stopping, or unusual occurrence en route, that the cars were in good condition, and that there was no rough or negligent handling of the cattle, but that, on the contrary, they were carefully handled and' inspected at various points during the trip.
 

 The testimony of both the plaintiff’s and the defendants’ witnesses show that, when the grown cattle arrived at Torras, a large number of them were badly bruised,- the hides being tox-n at diffex-ent places, particularly on their hips and shoulders, that several of them had their horns knocked off and a few had their legs broken, ,and that the cattle appeared to be in very bad condition, some of them dying immediately after coming from the railroad cars.
 

 The veterinarian who testified in behalf of the plaintiff was of the opinion that the cattle did not die of arsenical poisoning, whereas the veterinarian who testified for the railroad company diagnosed the case as one of arsenical poisoning. The third veterinarian
 
 *868
 
 who was used by both plaintiff and defendants as an expert stated that, where cattle were dipped in the regular arsenic solution and sufficient time was not allowed for them to- dry, before loading them into the railroad cars, the heat generated by the close proximity of the bodies of the animals to each other caused the arsenic to be absorbed by the cattle through their skin. He further states that, under these circumstances, the heat would make the arsenic active, causing an irritating and burning sensation to the animals’ hides which would make them unruly, wild, and restless; he described the symptoms of arsenical poisoning as the cracking of the skin, extreme hardening of the skin, marked inflammatory areas in connection therewith, and profused diarrhea. Some of the lay testimony is to the effect that these conditions were noted among the grown cattle.
 

 The trial judge, in his reasons for judgment, stated:
 

 “I think it is shown by a clear preponderance of evidence that, from the time these cattle were loaded they were handled with proper care and were not subjected to any treatment from which injury or death could have ensued. I think it is also clearly shown that' while the cattle were in transit no accident occurred which could have contributed to the loss or damage herein sued for. * * *
 

 “I have made a careful examination and study of the entire record, and of the authorities cited in the able and exhaustive briefs of counsel and I have arrived at the conclusion that the proximate cause of the loss which plaintiff has sustained was arsenical poisoning resulting from dipping or dippings to which plaintiff’s cattle were subjected prior to the delivery to the initial carrier and resulting particularly from the last dipping.”
 

 AVhile it is true that the calves would be better able than the grown cattle to withstand rough handling, it is most difficult for us to conceive how so many of the grown cattle could have been so terribly and badly injured as the result of alleged rough and careless handling when only one calf was injured. The only plausible explanation why the grown cattle were so badly injured and killed is that they were not thoroughly dry at the time they were placed in the cars and the arsenic became active and caused them to become unruly and restless and to injure one another. It is our opinion that the calves did not suffer a similar fate because they were dry when placed in the cars, and consequently the arsenic, according to the testimony of all of the veterinarians, would have no effect.
 

 AVe conclude, as did the trial judge, that the defendants have successfully borne the burden of exculpating themselves from fault, and that the proximate cause of the death of the cattle was arsenical poisoning. Glaser v. New Orleans, Texas & Mexico R. Co., 10 La. App. 755, 120 So. 798; Bowie Lumber Co. v. Yazoo & Mississippi Valley R. Co.,
 
 14
 
 La. App. 454, 131 So. 689; Simms & Sons v. Railroad Co., 122 La. 271, 47 So. 602; McHenry Horse Exchange v. Illinois C. R. Co., 148 La. 49, 86 So. 649; Chalona Co. v. American Railway Express Co., 11 La. App. 18, 123 So. 147; Adams Express Co. v. Croninger, 226 U. S. 491, 33 S. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; Union Pacific Railroad Co. v.
 
 *870
 
 Burke, 255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656; American Railway Express Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414; article 2754, Rev. Civ. Code.
 

 For the reasons assigned, the judgment appealed from is affirmed.