FELD *v.* COLUMBUS & G. RY. CO.*

(Division B.   April 1, 1929.)

[121 So. 172.   No. 27553.]

*Corpus Juris-Cyc References: Carriers, 10CJ, section 576, p. 373, n. 95; section 601, p. 391, n. 30; section 603, p. 393, n. 53. As to burden of proof when the defense in an action to recover for loss or injury to goods during carriage is act of God or vis major, see annotation in 29 L. R. A. (N. S.) 663; L. R. A. 1915D, 547; 4 R. C. L. 923; 1 R. C. L. Supp. 1237.

*Wasson & Wasson,* for appellant.

*Percy & Percy,* for appellee.

604

608

GRIFFITH, J. The trial judge submitted this case to a jury under pertinent instructions and upon full evidence, and the jury returned a verdict for the defendant railway company. The evidence discloses, and in view of the verdict we must assume that the jury found, the salient facts as follows:

On the morning of April 21, 1927, between six and seven o'clock, the levee on the east side of the Mississippi river broke at Mound's Landing, about eighteen miles by air line north of the city of Greenville, as a result of which an area approximately sixty miles wide east and west, and about one hundred miles long from the middle of Bolivar county south, was inundated, at an average depth of between five and six feet. Not only was this overflow unprecedented, since the establishment of the public levee system, in extent and depth, but a feature more momentous was that the velocity with which the waters moved downward and outward into and over the areas affected was at least three times that which had ever been seen or heard of in any overflow within memory.

At a point only about two miles north of Greenville, there was a section of levee known as Miller's Bend. All those in authority, and upon whose skilled judgment there was the greatest dependence, had regarded the levee at the latter point as being weaker, the more liable to break, and therefore more dangerous than the levee at Mound's Landing. When the latter broke, the increased apprehension that the weaker one at Miller's

Bend, almost within the outskirts of the city, would soon break, resulted in great excitement among the inhabitants of the city, in many of whom the state of their fear rose to a panic—this because in conjunction with the break already in existence it had been and was the prediction and judgment of those in the best position to make dependable forecasts that a break at Miller's Bend would inevitably and quickly submerge the entire city of Greenville, and every house and place of storage of goods and property within its bounds.

The western terminus of the line of appellee railway was in the city of Greenville. On the day of the break at Mound's Landing, appellant delivered to appellee in Greenville for transportation two hundred seventy-five sacks of sagrain, and three hundred forty-five sacks of peas, in the aggregate value of approximately three thousand five hundred dollars; the loading into the cars having been completed about five o'clock that afternoon. The next freight train due to leave on appellee's line was at eight thirty o'clock the next morning. At eleven o'clock of the night of the 21st, the day of the break and the day of the loading as aforesaid, a freight train of appellee with two locomotives reached Greenville from the east. The crew of this train had seen no water on or threatening the line of the railway. At this hour, also, the section foreman of that section of the track, which according to previous experiences would be the earliest affected, was traversing the involved area on a motorcar, but had seen no water.

In this situation at the said hour of eleven o'clock, the railway company was faced with this dilemma: It had in hand two freight locomotives that had just arrived, and it had nearly forty cars of freight loaded and ready to move; it had a track open to the east to the hills and points of safety. But how long this track would remain open no man could know, except that it would not be more than a few hours, or at most a day or thereabouts.

On the other hand, to remain standing in Greenville there might come that night, or at any subsequent hour, the waters from the Miller's Bend break then anticipated, and which, had it happened, would have ended any hope of saving any of the nearly forty cars of goods and property in its hands.

Confronted with these two alternatives, the railway determined upon the course of taking what then appeared to be the best chance. It turned its locomotives to the east, and the crew without stopping for food proceeded with all the energy of which its men were capable to prepare a train to make the run to the hills. In one hour and ten minutes the train left the city of Greenville, that is, about ten minutes past midnight, stopping at sidetracks long enough to pick up additional cars ready to go. About twelve-twenty all this was finished, and the train got definitely under way beyond the city limits. When approaching a small settlement called Paducah about two and one-half miles east of Greenville, it was discovered that water, apparently about two inches deep, had come upon the tracks at what was described in effect as a comparatively low place. It was thought by the engineer that by proceeding cautiously here, but nevertheless without stopping, he could reach higher ground just ahead, and thence be able to make time without further hindrance; it appearing from the evidence that in this territory, in the light of previous experiences, it was not considered unwise to proceed when only a few inches of water was on the track. However, in a few moments the train came suddenly to a stop, and it was discovered that one of the cars at about the middle of the train, consisting as it did of nearly forty cars, had got out of alignment, thereby automatically putting on the air brakes on every car and making it impossible to move either forward or backward. The crew then promptly cut the locomotives and tenders loose from the train in the effort to escape with the loco-

motives, but having so done and having moved the locomotives forward only a short distance, the track ahead was seen to rise up in the manner described by the witnesses "like palings on a picket fence," and so rapidly did the waters rise that some of the crew betook themselves to trees, where they remained until rescued late the next day. The freight cars were partially submerged and so remained for about sixty days, with the result that the freight of appellant was practically ruined; hence this suit.

A view of the unprecedented and theretofore almost unbelievable rapidity with which these waters came down, and thereupon rose in height, is obtained from the testimony of Mr. G. G. Rowland, who lived at Paducah and only a short distance from the point where this train was overtaken and inundated. He says that about twelve-thirty o'clock that night—and which therefore was about twenty minutes after this train left Greenville, he heard the fire whistle in Greenville, a signal which he had understood was to be given if the waters should come over the city protection levees. He called the city police station by telephone and asked whether the city levee had broken, and was answered in the negative. On the evening before he had placed a white rag in his yard at a point where some backwater from a neighboring lake had appeared, and after telephoning as aforesaid, he looked at this marker and found no change in the water. He went back into his house, but remained awake. In about thirty minutes he heard a peculiar noise "like a stiff breeze blowing through the tree tops," whereupon he went out immediately and found that the waters were everywhere, that in a few minutes horses were swimming in his yard, and that within thirty minutes after he heard the noise of the water as aforementioned, the water was three feet deep in his house, the house being four feet above the ground; in short, that within not exceeding sixty minutes after twelve-thirty

o'clock the waters had appeared and had risen to a height of seven feet.

The court gave the following instruction for the plaintiff: "The court instructs the jury that the plaintiff is entitled to recover in this case, unless the jury believe from the weight of the evidence that the seed sued for were lost or damaged by what is termed, under the law, an act of God; and, to constitute an act of God, it must arise from some violent disturbance of the elements, such as a storm, tempest or flood, and must be the immediate, proximate and sole cause of the loss or damage, not concurred in by the negligence of the defendant; and the burden of proof is upon the defendant in this case to show from the weight of the evidence not only that the loss and damage to the seed in question was caused by a violent flood, but that the defendant and its employees were free from fault, which did not contribute to, or cooperate with the flood in causing loss or damage to the seed."

The above instruction—except for a slight involvement in the language of the last three lines, and also in respect to the doubtful propriety of the use of such a strong expression as is found in the clause "free from fault"—correctly and with an admirable succinctness states the law on the subject as found in the weight of authority in this country, and particularly so when taken in connection with the two instructions granted at the instance of defendant, as follows:

"The court instructs the jury for the defendant that in the emergency following the break in the levee, the only duty of the railroad was to use, actively and energetically, all means at its command, or that might reasonably be expected of a company engaged in their business to possess, to meet the emergency and save property confided to their care from injury; and only neglect to use the means which prudent, skillful men in

their business might ordinarily be expected to use in such an emergency will subject them to liability.''

''The court instructs the jury for the defendant that in a crisis such as you may believe from the evidence followed the breaking of the Mississippi River levees, the defendant railway company and its employees are under the duty to act as careful, reasonable men would act under the circumstances to protect the property entrusted to them and their actions are to be judged in the light of conditions then surrounding them and not in the light of what subsequent events showed could have been done.''

If the foregoing had been the only instructions asked and given, then without further discussion we would unhesitatingly say that, taking them together as aforesaid, they presented a fairly approximate exposition of the law applicable to the controlling facts and moreover were entirely sufficient for the case. That the burden of proof was properly placed by these instructions is sustained by *Yazoo & M. V. R. R. Co.* v. *Craig,* 118 Miss. 299, 318, 79 So. 102. But appellant complains that the court refused an instruction requested by appellant marked No. 3 in this record. This instruction involves, as a material part of its language and as an essential portion of an element sought to be thereby injected into the case, the proposition that, if ''plaintiff's seed . . . would not have been injured or damaged if said train had been kept in its yard at Greenville, . . . the defendant must bear the loss.'' It is true that this language was carefully wrapped in other terms, nevertheless it was susceptible of an unjust construction, in view of the fact that, contrary to general expectations, it turned out that the levee at Miller's Bend did not break, and although the waters did partially submerge the city of Greenville it happened that freight, if stored in appellee's freighthouse in Greenville, would not have been reached by the water that afterwards came into the city.

"It is no proof of negligence that because after an injury has resulted it can then be seen how the injury might have been avoided." *Smith* v. *Western Ry.*, 91 Ala. 455, 8 So. 754, 11 L. R. A. 619, 24 Am. St. Rep. 929. The appellant complains also of the refusal of the court to grant its fourth requested instruction, but everything in that instruction is substantially embraced within the other instruction granted to plaintiff, hereinbefore quoted and set out in full.

The other assignments of error, including the complaint that the court refused to grant a peremptory instruction in favor of appellant, are all substantially embraced or bound up in the contention of appellant that it was negligence, and therefore a concurrent cause of the damage, on the part of the railway company in braving the dangers of the flood when its track was seriously threatened, and that the train should not have been sent out in the absence of reports from along the threatened area up to the very time when the train departed. Even so, the undisputed testimony shows that a section foreman was out on this threatened section in a motor car under duty to report at the first sight of danger. He had seen none up to the very moment when the waters caught the train. He had been as far out as twelve miles, and to Elizabeth, at which point, according to all previous experiences in prior floods, the waters first reached in their southward course, and was on his return still without seeing any flood waters until he arrived at Paducah, which point he reached at about the same time as the train. If, before leaving the yards in Greenville, which was at twelve-ten, or even if when the last car was picked up on the outskirts, that is to say, the hour of the final departure about twelve-twenty, the railway had telephoned to Mr. Rowland at Paducah, the information would have been received from him that there were no flood waters in sight; that the marked place in his yard in sight of the railroad track showed no change since the

falling of night. It is undisputed that any information they would have received along the line, even up to the last moment of final departure, would have been to the same effect. Unless these railway employees are to be held to an understanding of the future, and to a prescience beyond other men, there is nothing in the record of the testimony, and no logical or reasonable inferences to be drawn therefrom, upon which the jury could justly have attached the blame of an actionable concurring negligence upon these employees. The testimony is undisputed that, in all the recurring floods in all the past within memory, no flood waters had ever moved outward and downward with the celerity of this particular visitation. Under all previous experiences, the water was not to have been expected for several hours, or even for a day, at the point where it overtook this train. The unexpected rapidity with which it came and rose is shown, not only by the testimony of Mr. Rowland, above mentioned, but is pictured in an equally vivid way by Mr. C. P. Williams, a lifelong resident of the county, and who for fifteen or twenty years has been one of those in charge of levees in all the high-water fights in that time. He testified that he was at his home four miles below where this train was caught, that he himself was caught about one-fourth of a mile from his house, and that he had the greatest difficulty in reaching his dwelling, which, when he reached it, running as fast as he could, was surrounded by water knee-deep in so short a time, and that the water was nine feet deep in six and one-half hours thereafter.

Upon the whole case we think the record is free of any materially harmful error, that the correct result was reached, and that the judgment should be affirmed. *Nashville & C. R. R. Co.* v. *David,* 6 Heisk. (Tenn.), 261, 19 Am. Rep. 594; *Seaboard Air Line Ry.* v. *Mullin,* 70 Fla. 450, 70 So. 467, L. R. A. 1916D, 982, Ann. Cas. 1918A, 576; *Gulf Coast Transp. Co.* v. *Howell & Son,* 70 Fla.

544, 70 So. 567, L. R. A. 1916D, 974; *St. Louis, etc., R. R. Co.* v. *Dreyfus*, 42 Okl. 401, 141 P. 773, L. R. A. 1915D, 547; *Armstrong, Byrd & Co.* v. *Ill. Cent. R. R. Co.*, 26 Okl. 352, 109 P. 216, 29 L. R. A. (N. S.) 671; *New Brunswick Steamboat & Canal Transp. Co.* v. *Tiers*, 24 N. J. Law, 697, 64 Am. Dec. 396; and see also the numerous authorities cited in the opinions and notes of the annotated reports of the foregoing cases.

*Affirmed.*