BALTIMORE & O. R. Co. *v.* JOHL & BERGMAN.

(Division A.   Jan. 3, 1938.)

[177 So. 778.   No. 32917.]

HON. J. L. WILLIAMS, Chancellor.

594

**Percy & Farish,** of Greenville, for appellant.

**D. S. Strauss,** of Greenville, for appellee.

600

**McGowen, J.**, delivered the opinion of the court.

This is an appeal from the chancery court of Washington county, wherein a money decree was rendered by this court in favor of the appellees for $282.44. The decree was for a loss sustained by the appellees because of damage to a shipment of shoes transported by appellant from Long Island City, N. Y., to them in Greenville, Miss.

Jurisdiction of this proceeding in the chancery court was obtained under the provisions of section 173, Code 1930, writs of garnishment having been issued against two railroad companies, the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company. The appellant, the Baltimore & Ohio Railroad Company, having entered its appearance and filed an answer to the bill of complaint, the suit was dismissed as to the other two railroad companies.

The bill, in brief, alleged the shipment, of three cartons of shoes from New York to the appellees, in Greenville, Miss., on March 16, 1936, the shipment having been delivered to the appellant railroad apparently in good order and condition. There is no question as to the value of the goods. The answer claimed that the loss was by an act of God, an unprecedented flood, and not caused by any act of negligence on the part of the carrier.

The bill of lading offered in evidence contained the following: "No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God," etc.

The appellant, in its answer, admitted receiving the shoes in good condition; that the market value was as alleged; that two cartons of the shoes were delivered to the appellees in a damaged condition. As part of its answer and as a defense to the action, it was asserted by the appellant that the damage to the goods was not caused by negligence on its part, or its agents or employees, but by the flood waters in the spring flood of

1936 at Brunswick, Md., which entered the car in which the said shipment was, and that the damage was caused by an act of God for which the appellant is not liable.

The appellees offered in evidence the bill of lading, and Bergman, one of the appellees, testified to the delivery of the shipment in question, a part of which was damaged and in bad condition. He accepted those shoes which were not in a damaged condition, testifying as follows: "They were taken out of the original cartons and just dumped into a paper box, . . . Had the shoes been taken out of the box, and given proper attention, ninety per cent could have been saved, but they were thrown in a box, while they were all wet, and the water ran, one shoe to another, maybe one shoe would be damaged, and another shoe next to it you might say was practically dry." The shoes in question were fancy shoes, white suede, and were spotted, in the opinion of Bergman, by water running from one box to another, and by being in close proximity to shoes that were wet. He stated that 75 per cent. of the damage could have been obviated if the shoes which were wet had been segregated from those which were dry, but that he knew nothing as to the cause of the damage, when or in what manner the shoes were damaged.

The appellees also offered the deposition of Hoskins, general superintendent of the railroad company, who testified fully as to the damage, the material part of which is, in substance, as follows:

The shipment in question left New York City in the carrier's car, B. & O. 174782, on March 16, 1936, and was received in Brunswick, Md., at 9:10 a. m. on March 18th. Some time after 10 o'clock of the night of the 18th the flood waters rose to such height as to enter this car 6 inches to 4 feet and partly immerse two of the cartons of shoes placed on the floor thereof. In addition to the carload of miscellaneous merchandise of which this shipment was a part, there were in the train 4 cars of merchandise; 9 cars of fertilizer; 3 cars of gasoline; 1 car

of asphalt; 1 car of rockwool; 1 car of woodpulp; 1 car of lime; 1 car of ore; and 1 car of lumber.

The car in which the shipment in controversy was being transported contained 35 various shipments, 23 of which were damaged by water. This car was en route to Louisville, Ky., on appellant's carrier where the contents of the car were to be separated and sent to their various destinations, the particular shipment here to be sent to Greenville, Miss. This car, B. & O. 174782, standing on the railroad track, was inundated with flood waters, and remained standing in the yard of the carrier until the 23d of March, when it was sent to Louisville, Ky., arriving there early in the morning on the 25th of March, where the shipment in question was examined and the three cartons were shown to have been removed.

According to the testimony of the employee of the carrier who examined the shipment and made the transfer, the contents of two of the cartons were damaged by water, the wet shoes being transferred to a new carton and sent forward in that condition to Greenville, Miss. While the car in question remained in the Brunswick yards, no effort was made to minimize the damage to the goods which had been wet by the flood waters, nor at any other point while en route from there to Greenville, Miss.

The evidence shows, without dispute, that on the night of the 18th of March, 1936, there occurred at Brunswick, Md., an unprecedented flood, the like of which had not been known in that section since the Johnstown flood of 1889. There was no river gauge at this point, the nearest being the Bureau Gauging Station at Harper's Ferry, W. Va., 6 miles upstream from Brunswick, Md. The overflow was from the Potomac river, the area of which is 14,638 square miles, and about 10,000 square miles of which is upstream from Brunswick. For ten days prior to the 18th there had been intermittent showers in the watershed of the Potomac river which saturated the area with water, during which time the ice and snow were

melting; 18 feet was shown to be the gauge of the river at Harper's Ferry at flood stage on the night of the 18th, and by the morning of the 19th the river gauge had reached the height of 36.5 feet. Prior to the 17th and 18th of March, according to the report of the Federal Weather Bureau, the rainfall was insufficient to cause flood stages in the Potomac river basin, but the rainfall on the 17th and 18th became unusually heavy, the amounts, exceeding 5 inches, occurring over a large area in the upper watershed in less than twenty-four hours. This heavy rainfall was sufficient in itself to cause flood stages. On the 17th the carrier had ceased transporting freight west of Brunswick because of flood waters. Between 3 and 4 o'clock of the afternoon of the 18th, the waters of the Potomac river at a point near Brunswick reached flood stage.

Appellant carrier maintains two yards at Brunswick, Md., one for westbound traffic and the other for eastbound traffic, the ground of the latter being considerably higher than that of the westbound yard; and, had the goods been left in the eastbound yard, there would have been no damage to the goods by flood water. The witness stated that the westbound yard was the proper place for stationing the car in question to be sent on its westward journey. The two yards were about one mile apart. As a precautionary measure about noon the yard people were instructed to remove all cars in the westbound yard to the eastbound yard. There were five switch engines available. This work was proceeding according to schedule when the water suddenly rose and flooded the westbound yard, entering the pits of the boiler house, which was at the lowest point of the westbound yard, and drowning the fires and putting the mechanically operated switches between the westbound and eastbound yards out of commission. Efforts were continued to clear the westbound yard by operating the switch engines through the water, but the switches had become fouled by mud and other débris, so that, when the effort was made to

remove the train carrying this shipment, one of the leading cars became derailed, and, "as it was impossible" on account of the rapidly rising water to re-rail it, all the cars in this train had to be abandoned to the mercy of the flood. When this effort to remove the cars to higher ground was frustrated by reason of the water crippling the switches, it became necessary to leave the car containing the shipment in question to its fate; quoting the superintendent, "There was nothing we could thereafter do to keep this shipment from being damaged if the water rose high enough to flood the floor of the car, which is what happened."

The shipments in this car weighed from 40 to 1,875 pounds each, and the witness testified that it would have been practically impossible, even had their employees at Brunswick been able to reach the car through the water, to get this shipment out of the car. He further testified that, when the carrier received the shipment at New York on March 16th, weather conditions were absolutely normal and so remained until after the shipment reached Brunswick; that, in fact, as late as 10 o'clock the night of March 18th, although the water had overflowed its banks and had risen over the tracks in the westbound yard, there was no thought or fear that the water would rise high enough to reach the floor of the cars, as in the memory of some of the oldest employees at Brunswick who had lived there all their lives, at no time since the Johnstown flood in 1889 had the water at the Brunswick yards ever flooded the tracks there. On the 17th and 18th, there were warnings of the Weather Bureau apparently available to the officers of the carrier that a flood stage was threatened, but no warning of an unusual or extraordinary flood. The crest of the river flood was reached about 5 a. m. of March 19th.

The witness further stated that nothing could have been done after the water rose to the floor of the car to prevent damage to this shipment with the number of

freight cars in the eastbound yard, and the number of shipments other than the one here in question in the particular car which was damaged; that the railroad had no facilities at Brunswick with which to unload and sort the freight at that point, and no effort was made so to do for that reason. He also stated that two of the cartons which were damaged by water were on the floor of the car; the carton of shoes undamaged was resting on the other two cartons, and therefore did not become wet.

The talleyman of the appellant at Louisville stated that two cartons of the shoes were wet from the flood water, and that all the wet shoes were put into one carton; that "There were no good shoes put in with the wet ones—they were all wet and damaged by water;" and that they were found on the car floor with the original cartons broken open.

The liability of the carrier is founded upon the Carmack Amendment to the Interstate Commerce Act, 49 U. S. C. A., section 20(11). The shipment here was moving in interstate commerce.

It is contended by the appellant that the direct, proximate cause of the damage to the shipment in question was the act of God, in that the proximate cause of the loss or damage here was an unprecedented flood, and that the evidence in its behalf shows that it was guilty of no negligence concurring with, or contributing to, the act of God; and in that state of the case the burden then was cast upon the appellee that, notwithstanding the flood, the loss could have been averted by the exercise by the carrier of reasonable care and skill in invoking the rule, as it contends, which is adopted by the federal courts, the Supreme Court of the United States, and many other state jurisdictions.

Appellee seems to concede that the rule in this particular adopted by the Supreme Court of the United States is the correct one, but contends that the appellant railroad company was negligent in that it did not act

with ordinary care in placing the car containing the shipment in the westbound yard when it could just as easily have placed the car in its eastbound yard, a mile distant therefrom, where it would not have been damaged by the flood waters; and, moreover, it had received warning of the flood and did not exercise due and ordinary care in regard to this shipment; that, further, the shipment was placed in the yard where the boiler room was situated—in the lowest point of the westbound yard —and where the waters came in putting out the fires and putting the mechanically operated switches between the westbound and eastbound yards out of commission, thus blocking the movement of the car elsewhere. Appellee contends further that only a part of the shipment was damaged by the height of the water, and that the carrier did not use due care in preserving the shipment after the water had receded; that the burden was on the carrier to show what part of the damage resulted from the excepted risk and what part resulted from its negligence and failure to do this; that it is, therefore, responsible for the entire loss.

In Memphis & C. Ry. Co. v. Reeves, 10 Wall. (77 U. S.) 176, 19 L. Ed. 909, the Supreme Court laid down this rule: ''When a common carrier shows that a loss was [caused] by some vis major, as by flood, he is excused without proving affirmatively that he was guilty of no negligence. The proof of such negligence, if the negligence is asserted to exist, rests on the other party. In case of a loss of which the proximate cause is the act of God or the public enemy, the common carrier is excused though his own negligence or laches may have contributed as a remote cause.'' This principle seems to have been first adopted in York Mfg. Co. v. Illinois Central Railroad Co., 3 Wall. 107, 18 L. Ed. 170, and seems to have consistently followed with variations as to the reason for the rule, which is a modification of the common-law liability of a common carrier.

The common-law liability of a common carrier is that

of an insurer, and the only exception thereto is the act of God or of the public enemy; and the duty of the carrier was not only to show that the act of God was the proximate cause of the damage or loss, but the burden was further on it to prove the absence of negligence on its part, for the reason that the facts to be proven are within the knowledge of the carrier; and that is the rule in Mississippi as found in Chicago, St. L. & N. O. R. Co. v. Moss & Co., 60 Miss. 1003, 45 Am. Rep. 428; Newberger Cotton Co. v. Illinois Central R. Co., 75 Miss. 303, 308, 23 So. 186.

The Carmack Amendment provides in part that the carrier shall be liable to the lawful holders of the property being transported for any "loss, damage, or injury to such property, caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered." In Adams Express Co. v. Croninger, 226 U. S. 491, 33 S. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.), 257, the Supreme Court of the United States said: "Rights and remedies conferred by existing state laws, where a shipment accepted by a carrier for interstate transportation has been lost, injured, or damaged, were not continued in force by the provision in the Carmack amendment of June 29, 1906, to the Act of February 4, 1887, section 20 [49 U. S. C. A., section 20(11)], that nothing therein contained shall deprive the holder of the receipt or bill of lading of any remedy or right of action which he has under existing law, but such proviso only preserves to such holder any right or remedy which he may have had under existing Federal law at the time of his action." The court further said that "The intent of Congress to take possession of the subject of the liability of a carrier under contracts for interstate shipment, and to supersede all state regulations with reference to that subject, so clearly appears from the Carmack amendment of June 29, 1906 . . . as to invalidate, as applied to interstate shipments, the provisions of any state law nullifying contracts limit-

ing the liability of a carrier for loss or damage to the agreed or declared value." Also see Central Vermont R. Co. v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252.

The Croninger Case, supra, approved the principle announced in the case of Memphis & C. R. Co. v. Reeves, supra; and again in Southern Railway Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836, Chief Justice Hughes held that the state court of South Carolina erred in refusing to apply the burden of proof rule as announced by the federal courts. See, also, Galveston, etc., R. Co. v. Wallace, 223 U. S. 481, 32 S. Ct. 205, 56 L. Ed. 516; Republic of France v. French Overseas Corp., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; Schnell v. The Vallescura, 293 U. S. 296, 55 S. Ct. 194, 79 L. Ed. 373; Barnet v. New York Cent. & H. R. R. Co., 222 N. Y. 195, 118 N. E. 625; 46 A. L. R. 312; Louisville & N. R. Co. v. Finlay, 233 Ala. 128, 170 So. 207; Ohio Salt Co. v. Baltimore & Ohio R. Co., 204 Ill. App. 376; Cleveland, C. C. & St. L. Ry. Co. v. Hayes, 181 Ind. 87, 102 N. E. 34, 103 N. E. 839; Kessler & Co. v. Southern R. Co., 200 Ky. 713, 255 S. W. 535; Continental Paper Bag Co. v. Maine C. R. Co., 115 Me. 449, 99 A. 259; Northwestern Consolidated Mill. Co. v. Chicago, etc., R. Co., 135 Minn. 363, 160 N. W. 1028; Dolan Fruit Co. v. Davis, 111 Neb. 322, 196 N. W. 168, 32 A. L. R. 107; Barnet v. New York Central & Hudson River R. Co., 222 N. Y. 195, 118 N. E. 625; Toledo & O. C. R. Co. v. Kibler & Bros. Co., 97 Ohio St. 262, 119 N. E. 733. The courts above followed the view set forth in the Moss Case, supra, prior to the enactment of the Carmack Amendment, but subsequently have followed the federal rule as to the burden of proof.

On first blush it would seem that our court had refused to follow the federal courts as to the burden of proof in the case of Feld v. Columbus & G. Ry. Co., 153 Miss. 601, 121 So. 272; but that opinion appears to be based upon an intrastate shipment, and, of course, our court will adhere to its own rule where an interstate

shipment is not involved. In the Feld Case, the Carmack Amendment is not referred to in the report thereof.

Does the evidence which we have set out show negligence or want of due care under the facts of this case on the part of the carrier concurring with the act of God—an unprecedented flood? To put it another way, did the common carrier as a reasonably prudent person have reasonable ground to believe and foresee that the unprecedented flood described might probably ensue when it received the shipment at its yards in Brunswick and thereafter until the damage occurred? The evidence is that no flood had ever interfered with the operation of the westbound yard where the goods were placed prior to this flood; and the evidence further shows that there was no warning given by the weather bureau or otherwise to such common carrier that there would be or might be an unprecedented flood impending.

Looking backward, we can now see that the goods would not have been damaged from the flood water if this shipment had been halted in the eastbound yard. But that is not the test: It is, could the carrier, its employees, and agent on that day have reasonably foreseen the unprecedented flood looking to the future under all the circumstances, including the unprecedented flooding of its tracks? Of course, if we say that the carrier was negligent in these particulars, then such negligence was the proximate cause of the damage and the act of God the remote cause, whereby the carrier would be rendered liable for the entire loss. This is not a case where the state of the proof shows that the damage is due either to an act of God or to the carrier's negligent failure to safeguard the shipment. The evidence in this case shows that the act of God—the unprecedented flood—was the sole proximate cause of the loss. See Barnet v. New York Central & Hudson River R. Co., 222 N. Y. 195, 118 N. E. 625; Louisville & N. R. Co. v. Finlay, 233 Ala. 128, 170 So. 207.

We think on all of the evidence which we have set

forth in detail faithfully that, when the railroad undertook to remove the goods as a precautionary measure from the westbound yard to the eastbound yard, there is nothing in the evidence upon which a reasonable man could infer that the railroad ought to foresee that a flood would probably ensue, the waters of which would rise to and above the floor of the car in which these goods were shipped. Likewise they ought not to be held for the damage following therefrom, because of lack of facilities to meet such an exigency. The prime object of a railroad engaged in interstate commerce is to continue the operation of its trains in order that commerce may move to and from in this nation as far as possible. After this flood, the tracks and trains of the railroad had to be repaired and reconditioned to move on the stream of commerce. And the evidence is undisputed that no facilities at that time existed for unloading its vast amount of freight and reconditioning it while in transit. Also the evidence of the talleyman is undisputed that this shipment reached Louisville when the goods were already damaged. From the night of the 18th until the 25th of March, the shoes, according to the evidence, had necessarily remained wet. They were suede shoes.

If the position be taken that it was the duty of the railroad to cease operation and remove from this car these cartons of shoes, then by the same reasoning a court would be compelled to hold that it was the duty of the carrier to so treat all the shipments in the 23 cars flooded on the night of the 18th and in the meantime discharge its prime duty of operating the railroad for transportation of commerce throughout the nation. We do not agree with the chancellor that the evidence in this case shows concurring negligence with the act of God in the loss covered here. We think the evidence points to the contrary, and is undisputed.

We are of the opinion that no negligence is shown on the part of the carrier prior to the damage of the

goods by the flood, or subsequent thereto. There will, therefore, be a judgment for the appellant.

Reversed, and judgment here for the appellant.